2320, Censormatic Electronics, LLC, against Wyze Labs, Inc., Mr. Krinsky. Thank you, Your Honor, and may it please the Court. I'd like to make, subject to Your Honor's questions, three points that I think cut across the issues in this appeal. First, there is no basis to say that any of the components, there's no basis to say that components of the claim systems, and in particular the ICDs of the claims, are conventional. Second, one aspect of what all of these claims are directed to is the novel configuration of these components, not to the abstract ideas that the District Court identified. And third, independently of the configuration, we have separate patents here directed to separate lumping them all together and simply concluding that they are all directed to the same abstract ideas of wireless communication and surveillance. To start with the first issue, if Your Honor's agree with this point, I can sit down. The ICDs are not conventional, and there's nothing in the record to suggest that they are conventional. If you take a close look at Wise's arguments, and in particular at page six of the red brief, you'll see that Wise focuses on the components of the ICDs, the notion being that, you know, because these have conventional camera equipment in them or because they have processors in them, therefore they must simply be conventional computer hardware. But this is not a case like the main run of Section 101 cases where we have simple conventional computer hardware on which we are implementing an abstract idea. This is a claim directed to a configuration of devices that our inventor in a log cabin created. And there's no basis, certainly not on the Rule 12 motion to conclude that the ICDs themselves are conventional components. On the contrary, the claims expressly recite that they have a processor. These are, in the words of the specification, intelligent appliances capable of communicating with other ICDs. And the claims also contain recitation of a receiver, which is not something that there's any indication in the security cameras had. But, counsel, you're not claiming an input capture device, the first input capture device. I gather what you've got is a conventional structure here for passing information back and forth. And doesn't, under our law, the fact that you're passing information back and forth mean that the invention is considered abstract? Your Honor, I disagree with the premise. These claims are directed to a configuration of multiple devices, and the devices themselves are not conventional. You know, that is a crucial difference between this case and, for example, the Chamberlain case on which the District Court relied so heavily. There, the record reflected there was a concession in the specification that the devices themselves were conventional, and that all that the invention was directed to was replacing wired links with wireless ones. Here, there's no such analog. There's no prior art configuration of components, nor, for that matter, are there any of these ICDs that, in 2004, you could just go buy at the store, meeting the Does the configuration have physical differences over the prior art, or were the electronic circuits different, or was it just software? Yes, yes, to both of the first two points. They are new, different devices, and it is not just software. It is hardware. Why aren't the devices claimed, per se? I'm sorry, Your Honor? Why aren't the devices claimed, per se? I mean, the claims here recite a configuration of devices that together serve a novel purpose. I don't, you know, I can't speak to why there is not a claim to an ICD before the Court today, but the question is whether these devices in the configurations of these claims are abstract, and there's no basis to say that they are. You could not buy, to my knowledge, and certainly there's nothing in the record to suggest that you could buy an ICD with a receiver and a processor operable to directly communicate with other ICDs. The prior art being distinguished here is where you have a security camera with a one-way configuration over a wire to some central base station, where you have, for example, a did not have ICDs that were capable of communicating directly with one another, nor did the prior art involve wired connections between them. How does the specification here teach how to do that? It doesn't. I mean, the specification... It's the idea of such communication. It doesn't teach one how to do it. Well, Your Honor, I disagree. I mean, first of all, I think that's an enablement question. You know, the question of whether the person of ordinary skill in the art having been provided with the concept of an ICD and this configuration of ICDs could put one together based on the disclosure of the specification is different from the question of whether these claims are directed to such a configuration. But if the only thing that's being described is a mode of communication without any further detail about it, that can be abstract. And so I'm asking you, is there any level of detail other than the concept of communicating this way? And I think the answer to that question is yes, even in the claims themselves, you have ICDs that are required to have a receiver, a processor, and direct cross-control with other ICDs. None of those things exist in the prior art. And those are not devices that were conventional. There's no finding here, nor could there be a finding on Rule 12 that that was something that existed in the prior art. And that takes this away from claims that are simply directed to the use of existing computers as tools. These are themselves claims to novel configurations. And the configuration itself recited in the claims is a technological solution to the problems of prior art systems and that have capabilities above and beyond the prior art systems. And there's no requirement in this claims recite details about how every element operates so long as they're sufficient to meet the enablement requirement and the written description requirement. The requirement for 101 is that what the patentee puts forward as their invention be something more than an abstract idea, what the claims are directed to. And here, that is this overarching configuration of unconventional devices. And the configuration itself is unconventional. I think WISE makes a considerable deal in its briefing about this question of whether the specification or the claims recite sufficient either specificity or sufficient advantages of these configurations. But if your honor looks at the other cases where this court has upheld similar configurations of devices under Section 101, for example, the TALIS case, you see a level of detail and a configuration of components that itself is concrete and is what the invention is directed to and is sufficient to confer patent eligibility. In the TALIS case, you had a system comprising two sensors and an element adapted to receive signals. And there was a 101 challenge on the basis that all this was the idea of using these sensors to calculate the position of an object in a particular way and the idea of communicating between these sensors. This court held that's not the case. This is a novel configuration of components. And the directed to inquiry ends there. There's no need to parse the details of how these things are configured in the specification, what further guidance the person of ordinary skill is given as to how to put these together. There's no indication the novel configuration that you're talking about is. I think you answered in the affirmative when I asked you before, are they physically configured to be novel or is it in the software that constitutes the configuration? They are physically configured to be novel. These ICDs, there is no suggestion in the record that these ICDs were a conventional component. You had prior art security cameras and some of the components of the ICDs are conventional. But that's true of almost any machine. If someone has a claim to a configuration of iPhones in communication with one another, the fact that the iPhones contain a conventional Wi-Fi chip doesn't render the invention abstract. On a motion to dismiss, it was improper for the court simply to assume that these ICDs are conventional and to ignore the recited configuration of multiple ICDs. I guess the ICD is a component of the surveillance system, right? Yes, Your Honor. The ICD, it's a claim to the surveillance system. The claim is to a surveillance system and the configuration of components, these ICDs that are operable to directly communicate with one another and with the DIR, that configuration is novel and takes us into a world away from simply implementing an abstract idea on a conventional system. We're not here talking about a computer system that existed before as a configuration. But on top of that, the individual components, the ICDs themselves are non-conventional. And there's no basis to conclude, again, on a Rule 12 notion that these are simply conventional components. Well, the problem is it doesn't say what they are. It just says they can communicate with each other. That's certainly an abstract idea to have proponents that can communicate with each other, right? No, Your Honor. I don't see how Your Honor can draw that conclusion, given that the ICDs themselves are recited as having these multiple different components. These are devices that have one or more sensors in them, but also are operable to communicate with other ICDs. I know my time has expired. I don't know if the panel has further questions. I would also like to direct the panel to the fact that we have five separate patents here. And in our briefing, we raised two additional inventions that are separately claimed in separate patents and can't be lumped together as being the same underlying invention. In particular, dual encoding is an example of the type of technological solution that arises newly in this context of wireless communication between devices and remote access directly to those devices where there are bandwidth considerations you wouldn't have in the wired world. And the solution to that problem that the inventor identified and claimed is to encode simultaneously. That's analogous to what this court concluded in Patent Eligibility Common Law. There's BASCOM, and it is quite far removed from the district court's identification of direct wireless communication or surveillance itself as the underlying abstract ideas. Is it correct that the district court did no analysis under Section 102 or 103 that the decision was entirely under Section 101? That's correct, Your Honor. That's part of the problem. This was a Rule 12 motion to dismiss on Rule 101 grounds, Section 101 grounds. Okay. Any more questions at the moment for Mr. Krinsky? No. Okay. We'll save the rebuttal time. Mr. Chen. Thank you, Your Honors. Good morning, and may it please the Court, Ruben Chen from Cooley, LLP, on behalf of the Pelley Wise Labs, Inc. Your Honors, this case has no real differences from this court's Chamberlain case, where the Federal Circuit found claims involving wireless communication to be directed to the abstract idea of wireless communication and having no inventive concept. Mr. Matic appears to argue that Chamberlain did not involve direct wireless communication between two devices without the server, but that is wrong. Chamberlain specifically involved direct wireless communication between a main device and a peripheral device or devices without going through a server. That is the main device could communicate wirelessly without a server with a peripheral device, and the peripheral device or devices could communicate wirelessly without a server with the main device. This is in the Chamberlain patent, patent number 7224275, figures 1, 2, and 6, and corresponding descriptions in column 5, lines 39 to 43, and column 7, lines 53 to 58. Moreover, in holding that the broad concept of communicating information wirelessly is an abstract idea, the Federal Circuit in direct wireless communication, and this makes sense because the communication between devices in Chamberlain was direct wireless communication. Now, with respect to step 2 of the ALICE test, the asserted claims here do not recite an inventive concept in the non-abstract realm. There is nothing recited in the claim that is significantly more than the abstract idea, and the specification of the asserted patent confirmed this. The claimed ICDs or input capture devices merely use commercially available technology such as antennas and known peer-to-peer protocols like Bluetooth and 802.11, and Sensormatic's reply brief admits this at pages 29 to 30. Sensormatic states that the ICDs use, quote, commercially available and unclaimed video technology and wireless protocols, end quote. And what I appear to be hearing from Mr. Krinsky today is actually a new argument that the ICDs somehow include components that are not conventional, but that's found nowhere in the briefing, and the specification confirms that only generic components such as antennas and only standard known communication protocols such as 802.11 and Bluetooth are used for the direct wireless communication here. Now, the Federal Circuit has repeatedly held that limiting an abstract idea to a particular technological environment is insufficient to transform the claims into a patent-eligible application of the abstract idea. So, applying direct wireless communication to the technological environment of video surveillance can't somehow transform the abstract idea into a patent-eligible application of the abstract idea. Nevertheless, it's worthwhile to point out that the specifications themselves here recognize the known use of direct wireless communication in video surveillance. For example, the 129 patent identifies prior art like U.S. Patent Application Publication Number 2004-0008255 to Llewellyn, which describes a video surveillance system in one police car directly communicating with a video surveillance system in a second police car using Bluetooth without going through a server. Okay, but when you're considering prior art, you're no longer talking about 101, right? You're talking about 102 or 103. Not necessarily, Your Honor, because here the specification is identifying the prior art and discussing what was already known, what was already conventional. And I just want to make it the focus of these claims are directed to abstract ideas. And he found that they were. And then separately, he rebutted arguments that were raised by Censormatic in the district court brief as to why they believe there was an alleged improvement in technology. And that was when Judge Connolly discussed the possibility of particular components or communication protocols, Your Honor. And so if I can continue, this is shown in the 129 patent specification at Appendix 32, at Column 2, Line 50 to Column 3, Line 3. And this is also shown in Llewellyn at Figures 3, 5, and 8, and further described in Paragraphs 43, 45, 46, and 47. For example, Paragraph 47 states that, quote, two vehicle video systems, 300 and 300A, may exchange digital information with each other, end quote. Therefore, the specifications themselves show that wireless direct cross-communication without going through a server was known in the technological environment of video surveillance. Now, Your Honors, I believe we're asking the right questions as to what is missing in the specifications here of the asserted claims. There is no how that's described here. There's no, and that's the problem for SensorMatic when you're considering either Step 1 or Step 2 of the ALICE test. SensorMatic claims do not recite how to remove the servers, where to place and configure the ICDs, how to program the ICDs, or how to otherwise make them communicate with each other directly other than identifying antennas and standard known communication protocols like Bluetooth and 802.11. And that is the problem there. Now, SensorMatic does raise three additional arguments for alleged improvements in surveillance technology and or for Step 2, an inventive concept. SensorMatic argues, first, that the ICDs extend wireless range by acting as data repeaters. Second, SensorMatic argues, specific to the 370 and 129 patents, that dual encoding is an improvement in the use of bandwidth and device compatibility. And SensorMatic argues, thirdly, that specific to the 772 and 019 patents, that the claim dimension improves retention of significant data by prioritizing trigger events. At the outset, WISE respectfully requests that the court reject these arguments because these arguments were never raised by SensorMatic in district court, and we think they should be deemed forfeited or waived. SensorMatic even has the gall to fault the district court for not addressing arguments it failed to raise. For example, SensorMatic, on page 39 of its opening brief and page 15 of its reply brief, faults the district court for not identifying the abstract idea of repeating data. But SensorMatic never raised the argument in district court that the ICDs can improve range by acting as data repeaters. A search in SensorMatic's district court brief reveals no argument about extending wireless range or data repeaters. Similarly, bandwidth appears nowhere in SensorMatic's district court brief. And with respect to SensorMatic's third argument, prioritizing storage or retention based on trigger events or based on anything else, for that matter, appears nowhere in SensorMatic's district court brief. In any event, WISE's appellee brief addressed all three of SensorMatic's new arguments, and I'll now further address them starting with the data repeater limitation. Notably, data repeater is only found in one dependent claim, claim four of the 772 patents. And SensorMatic can't argue that all ICDs are necessarily data repeaters because it's stated in the district court records that no claim construction was required. Moreover, a data repeater, which simply repeats data, is just a feature of the abstract idea of wireless communication. An apt analogy is the use of smoke signals by soldiers on the Great Wall of China during ancient times. And being able to repeat a message over a distance can also be seen in a common example of grade school children passing a note from student to student to student in a class. Additionally, the benefits of improved range that SensorMatic points to are simply not claimed. Further, even if it were claimed, an improved result, as your honors know, without more stated in the claim is not enough to confer eligibility to an abstract idea. Moving on to SensorMatic's second argument, SensorMatic argues that dual encoding improves the use of bandwidth and device compatibility in the 129 and 370 patents. But dual encoding is not at the heart of the claims, first of all, which again is directed to the abstract ideas of wireless communication and remote surveillance. The concept of dual encoding based on bandwidth is at most found in a handful of dependent claims, dependent claim 20 of the 129 patent, which, by the way, doesn't even recite dual encoding, and dependent claims 14, 15, 19, and 20 of the 370 patents. However, even if considered to be at the heart of the claims, dual encoding based on bandwidth is itself abstract. The Federal Circuit in adaptive streaming found dual encoding based on bandwidth to be an abstract idea. Specifically, the court recognized as abstract the, quote, idea of format conversion from an incoming signal's format to a variety of formats suited to different destination devices, end quote. And the claims at issue in adaptive streaming specifically recited encoding in different formats, quote, in response to change in bandwidth condition. So here, like in that adaptive streaming, the claims don't claim an improved way of dual encoding. Rather, the specification makes clear that the claim dual encoding is merely encoding two known formats simultaneously, one, a video format, and two, a format consisting of a series of still images, and deciding which of those formats to use based on bandwidth capability. So, the claims here are no different than those found ineligible in adaptive streaming. Moving on to SensorMatic's third and final argument, SensorMatic argues that prioritizing recording and retention based on trigger events is an alleged improvement in technology in the 772 and 019 patents. But prioritizing recording based on trigger events is not at the heart of the claims, which, again, are directed to the abstract ideas of wireless communication and remote surveillance. However, even if considered to be at the heart of the claims, this is just the feature of the abstract idea of remote surveillance or itself an abstract idea, the idea of retaining important information, or more broadly, the idea of organizing, classifying, and storing information. Many Federal Circuit decisions have found such claims patent ineligible. The Federal Circuit's electric power decision is directly on point. Notably, the representative claim at issue in electric power included the following limitation, detecting and analyzing events in real time from the plurality of data streams. And at step one, the Federal Circuit found the claims directed to the abstract idea of collecting information, analyzing it, and displaying certain results of the collection and analysis. And at step two, the Federal Circuit held that merely selecting information by content or source for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes. So, Your Honors, having addressed all of SensorMatic's arguments for alleged improvements in technology and our inventive concepts, I would just reiterate again that this case is no different than Chamberlain. Unless Your Honors have any questions for me, I'll see the remainder of my time. Any questions for Mr. Chen? No. No. All right. Thank you. Then we'll hear from Mr. Krinsky. You have your rebuttal time. Thank you, Your Honor. I'll begin at the end with Chamberlain. I think counsel's argument illustrates exactly how why it is missing the point and how the district court erred, because the question here is not, as I heard my friend on the other side say, whether the claims somehow involve wireless communication. The question is whether that is what the claims are directed to. And unlike in Chamberlain, where there was the only described difference between prior art systems and the claim systems is that the status information about the system is communicated wirelessly. Here, we absolutely dispute that that is the difference from the prior art. Counsel pointed to our reply brief where we conceded that the ICDs contain some conventional components. Our point there is that that's not what our claims are directed to. That's not what we were claiming. We're not claiming some new and improved camera such that it matters whether our claims include camera technology that was known. Counsel failed to read the very next sentence in which we raised this exact argument. Why it the advancements attributed in the, excuse me, I'm reading the wrong passage. At any rate, the improvement, this new configuration is not something that was in the prior art and certainly not something that can be concluded is conventional at Rule 12. On the point about the separate inventions, the dual encoding and the trigger events, here we have entirely separate patents. The 370 patent, in fact, has dual encoding in its title. It includes additional disclosure at Appendix 58 about how to do dual encoding. The notion that this is just some tack-on to the prior invention is just simply wrong. The claims here are directed to a new invention that is a solution to this technical problem that arises in this new context. Please continue your thought. Thank you. I was just going to say the same is true of trigger events. These are a technological solution that is separately called out in the 019 patent and certainly cannot be dismissed as the idea of wireless communication or the idea of surveillance. We have concrete inventions here involving a concrete configuration of unconventional components. The court should not have dismissed this case at Rule 12. Any questions for Mr. Krinsky? No. No. All right. Okay. Thank you. Thanks to both counsel. The case is taken under submission. Thank you.